```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
IN RE:                                          :
                                                :
WINDSTREAM HOLDINGS, INC., et al.,              :
                              Debtors.          :   **OPINION AND ORDER**
--------------------------------------------------------------x
U.S. BANK NATIONAL ASSOCIATION,                 :   20 CV 4276 (VB)
and CQS (US), LLC,                              :
                              Appellants,       :
v.                                              :
                                                :
WINDSTREAM HOLDINGS, INC., et al.,              :
                              Appellees.        :
--------------------------------------------------------------x
```

Briccetti, J.:

  U.S. Bank National Association ("U.S. Bank"), as indenture trustee for certain unsecured notes of Windstream Services, LLC, and CQS (US), LLC ("CQS") (together "appellants"), appeal from (i) a May 12, 2020, Order of the Bankruptcy Court approving a settlement between Windstream Holdings, Inc., and its debtor subsidiaries ("debtors"), and Uniti Group, Inc. (the "Settlement Order"); and (ii) a June 26, 2020, Order of the Bankruptcy Court confirming debtors' First Amended Joint Chapter 11 Plan of Reorganization (the "Confirmation Order").[1] Intervenor-appellee Elliott Investment Management L.P. ("Elliott"), the largest holder of first and second lien claims against debtors, along with other rights contemplated by the First Amended Joint Chapter 11 Plan of Reorganization (the "Plan") confirmed by the Confirmation Order, previously intervened with the consent of all parties.

---

[1] U.S. Bank appealed both the Settlement Order (20 CV 4276) and the Confirmation Order (20 CV 5440). CQS also appealed the Confirmation Order. (20 CV 5529). By Order dated August 3, 2020, the Court consolidated these three appeals under the above caption. Unless otherwise noted, all references to documents filed on the docket (Doc. #__) refer to those documents filed in In re Windstream Holdings, Inc. et al., 20 CV 4276. CQS joined and relied upon U.S. Bank's consolidated opening and reply briefs. (Docs. ##21, 50).

1

For the reasons set forth below, the appeals are DISMISSED as equitably moot.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 158(a).

## BACKGROUND

I.  The Uniti Transaction and Ensuing Litigation

Debtors are a collection of companies that provide telecommunications services throughout the United States. Beginning in 2013, debtors entered into a complex transaction that split their businesses into two companies, Windstream Holdings, Inc. ("Holdings"), and Windstream Services, LLC ("Services"), and spun off a real estate investment trust ("REIT") now known as Uniti Group, Inc. ("Uniti").

As part of the "Uniti Transaction," Services transferred various telecommunications operating assets, such as fiber optic cables, copper wires, and real estate, to Uniti. Holdings, which acted as the new Windstream parent company, then transferred a majority of the equity in its new subsidiaries (including Uniti) to existing shareholders. Finally, Holdings entered into a lease arrangement with Uniti, known as the "Master Lease," whereby Holdings leased the transferred assets back from Uniti and continued operating those assets through its subsidiaries. The Master Lease also required debtors to make certain improvements to the transferred assets, called "tenant capital improvements," and to maintain those assets at debtors' expense.

The structure of the Master Lease proved problematic for debtors' finances. For instance, debtors' rent payments remained unchanged even if portions of the networks and assets became unusable or destroyed. And although the assets naturally depreciated in value, debtors were obligated to pay rents that increased at a contractually set rate. After just two years, debtors' financial performance began to decline, their market capitalization became drastically reduced, and ratings agencies issued decreased ratings for debtors' bonds.

In 2017, Aurelius Capital Master, Ltd. ("Aurelius"), acquired a controlling interest in certain of Services's senior unsecured notes, for which U.S. Bank served as indenture trustee. Aurelius directed U.S. Bank to sue debtors in its capacity as indenture trustee. In that suit, filed in this district, U.S. Bank alleged Services breached a covenant contained in a governing bond indenture that restricted Services from entering into sale and leaseback transactions. See U.S. Bank Nat'l Ass'n v. Windstream Servs., LLC, 2019 WL 948120, at *1 (S.D.N.Y. Feb. 15, 2019). After a bench trial, Judge Furman found the Master Lease violated the sale and leaseback restrictions in the bond indentures, and therefore Services was in default of those agreements. Id. at *23. The court awarded Aurelius a $310 million judgment on February 25, 2019. Id. at *23–24.

II. Chapter 11 Proceedings and the Uniti Settlement

Debtors commenced Chapter 11 proceedings the same day.

After conducting an independent investigation, debtors commenced an adversary proceeding against Uniti in the Bankruptcy Court seeking to recharacterize the Master Lease as a financing agreement. Debtors and Uniti engaged in protracted litigation while also participating in parallel mediation before Bankruptcy Judge Shelley C. Chapman. Prior to trial in the adversary proceeding, debtors reached a settlement with Uniti (the "Uniti Settlement"), which they submitted to the Bankruptcy Court for approval.

The Uniti Settlement included a complex series of transactions (the "Uniti Settlement Transactions") that provided debtors with more than $1.2 billion in present value. The Uniti Settlement Transactions required Uniti to: (i) commit to fund an aggregate of $1.75 billion of "Growth Capital Improvements"—investments in long-term fiber network assets constructed by debtors; (ii) provide up to $125 million in loans for equipment purchases by debtors;

3

(iii) purchase certain of debtors' assets and contracts in exchange for roughly $244 million in payments to debtors, which would be funded through a purchase of Uniti's stock by Elliott and an ad hoc group of first lien lenders; and (iv) pay roughly $490 million to debtors in quarterly installments. (See Doc. #15-6 at ECF 52–57).[2]

In addition to the Uniti Settlement Transactions, the Uniti Settlement contemplated another agreement between debtors, Uniti, Elliott and its affiliated funds, and an ad hoc group of first lien lenders called the "Plan Support Agreement." The Plan Support Agreement memorialized debtors' and key creditors' acceptance of the Uniti Settlement and detailed a series of restructuring transactions embodied in the Plan.

Between May 7 and 8, 2020, the Bankruptcy Court held a hearing on the Uniti Settlement. The court found the proposed settlement was "intertwined" with debtors' eventual plan of reorganization and was "critical to [their] ability to successfully reorganize." (Doc. #15-4 at ECF 347). And, after reviewing the litigation risks debtors faced in their adversary proceeding against Uniti, the Bankruptcy Court approved the Uniti Settlement, finding it was "favorable to Windstream and well above the lowest range of reasonableness." (Id. at ECF 358).

III.   The Confirmation Order and the Plan

Debtors proposed their First Amended Chapter 11 Plan of Reorganization (the "Plan") on May 14, 2020. The Plan partially repaid debtors' pre-petition first lien lenders and partially converted those lenders' claims to equity. The Plan also canceled debtors' junior debt, thereby reducing their debt burden by roughly $3.6 billion and improving their cash flow by around $300

---

[2]   "ECF" refers to the page numbers automatically assigned by the Court's Electronic Filing System.

million per year. In addition, the Plan provided for the retention of certain employee pension benefits and permitted debtors to continue operating.

The Uniti Settlement forms an inextricable part of the Plan. For example, consummation of the Uniti Settlement Transactions was an express condition precedent to the Plan. And the cash value of the settlement was distributed to various classes of creditors through the Plan. Absent settlement of debtors' claims against Uniti, the Bankruptcy Court believed "there [was] serious doubt . . . as to whether third-party financing would be available for" necessary upgrades to Windstream's telecommunications network. (Doc. #15-4 at ECF 365).

The Plan also provided for certain transactions to occur on its effective date: (i) existing equity in debtors would be canceled and reorganized equity would be issued to first lien claimants; (ii) proceeds from a new senior secured credit facility would be distributed to first lien claimants and used to pay other allowed claims and fund various claim reserves;[3] (iii) liens granted under the new credit facility would be deemed approved; and (iv) debtors would consummate a $750 million rights offering to first lien claimants for reorganized equity interests.

The Plan contemplated full recovery for holders of secured and priority claims, and impaired recovery for other classes of creditors, including holders of first and second lien claims, holders of certain pre-petition notes claims, and general unsecured claims. Debtors' secured creditors and a majority of unsecured voting creditors voted to accept the plan. However, some unsecured creditors—including appellants—opposed the plan, which prevented debtors from reaching the two-thirds-by-amount threshold required for acceptance by the class of unsecured creditors. See 11 U.S.C. § 1126(c).

---

[3] A credit facility is an agreement permitting a borrower to borrow money over an extended period from one or multiple lenders. A senior secured credit facility guarantees the loans with the borrower's collateral and specifies the priority of those debts.

5

The Bankruptcy Court confirmed the Plan on June 25, 2020, after a two-day hearing. In its oral decision, the court undertook an exhaustive analysis of the requirements of 11 U.S.C. § 1129 and discussed each of the objections presented by various parties. The court rejected the objection that the Plan unfairly paid secured creditors more than the aggregate value of their collateral and adequate protection claims at the expense of unsecured creditors.[4] Specifically, the court found there was no unencumbered value to distribute to unsecured creditors given the value of the secured creditors' pre-petition and adequate-protection liens and superpriority adequate-protection claims.

In addition, objectors to the Plan, including appellants, argued the proceeds of the Uniti Settlement were unencumbered assets that should have been distributed to unsecured creditors like themselves. However, the Bankruptcy Court found more senior classes of creditors had a lien on the Uniti Settlement itself by virtue of a general lien on intangibles, because cash derived from the Uniti Settlement constituted proceeds of a litigation claim. In short, according to the Bankruptcy Court, the claims asserted by the secured creditors far exceeded "any reasonable assumption of unencumbered assets in an order of magnitude of hundreds of millions of dollars." (Doc. #15-9 at ECF 110).

On June 26, 2020, the Bankruptcy Court issued the Confirmation Order. (Doc. #15-9 at ECF 130–266).

IV.  Procedural History of the Appeals

Appellants timely appealed from both the Settlement and Confirmation Orders. They filed notices of appeal from the Confirmation Order on July 3, 2020. Thereafter, appellants moved to

---

[4]  Adequate protection claims compensate secured creditors for the post-petition decline in the value of their collateral. Adequate protection claims are typically provided either in cash payments or replacement liens on a debtor's property.

expedite and consolidate the appeals. The Court denied the motion to expedite but granted the motion to consolidate, and then set a briefing schedule, pursuant to which the appeals were to be fully briefed by September 16, 2020.

On September 1, 2020, appellants filed a "response" in the Bankruptcy Court to a motion seeking to establish procedures in furtherance of certain distributions under the Plan. In their "response," appellants included a "request" to "stay the effective date" of the Plan pending resolution of the appeals. (Doc. #56-1 at ECF 13–14).

On September 2, 2020, appellees filed their opening briefs on the merits of the appeals, arguing, among other grounds, that the Court should dismiss the appeals as equitably moot.

Two days later, U.S. Bank filed, and CQS joined, a motion for "a determination of post-effective date jurisdiction," or in the alternative, a stay of the Confirmation Order pending appeal (hereinafter, the "Equitable Mootness Motion"). (Docs. ##44, 45).

On September 17, 2020, the Bankruptcy Court denied appellants' request to stay consummation of the Plan. The Bankruptcy Court believed appellants' request for a stay was a "sham and a procedural gambit," filed in "response" to an unrelated motion. (Doc. #56-1 at ECF 22). The Bankruptcy Court also denied appellants' request for a stay on the merits because they failed to demonstrate irreparable harm, ignored any potential harm to other parties, and there was "a strong public interest in proceeding to conclude and permit [the Plan] to go effective." (Id. at ECF 24–25, 27).

By letter dated September 21, 2020, appellees informed the Court the Plan became effective and was substantially consummated that day. And by Memorandum Opinion and Order dated November 2, 2020, the Court denied the Equitable Mootness Motion, including appellants' request for a stay.

## DISCUSSION

I. <u>Standard of Review</u>

The Court has jurisdiction to hear these appeals pursuant to 28 U.S.C. § 158(a). The Court also has discretion to determine whether an appeal from a bankruptcy court is equitably moot. See In re Charter Commc'ns, Inc., 691 F.3d 476, 483 (2d Cir. 2012).[5] In so doing, the Court "may rely on the bankruptcy court's factual findings, unless clearly erroneous, and if necessary receive additional evidence." Id.

II. <u>Equitable Mootness</u>

First, debtors argue the Court should dismiss these appeals as equitably moot because vacating, reversing, and remanding either the Settlement Order or Confirmation Order would require "unscrambling" a plan of reorganization that was consummated several months ago, and would "devastat[e] the [d]ebtors' hopes of emerging from bankruptcy as a going concern and disrupt[] countless complex financial transactions." (Doc. #37 at ECF 25). Second, debtors argue appellants "made no meaningful effort to avoid that risk by [seeking to stay] the" Confirmation Order or Settlement Order. (Id.). Third, in the Equitable Mootness Motion appellants proposed several forms of relief that they now argue will be effective without vacating the Settlement and Confirmation Orders. Debtors argue those forms of relief are inequitable.

The Court agrees with debtors.

A. <u>Legal Standard</u>

In bankruptcy cases, "an appeal should be dismissed as moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable."

---

[5] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

8

Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.), 988 F.2d 322, 325 (2d Cir. 1993) (hereinafter Chateaugay I). "As a practical matter, completed acts in accordance with an unstayed order of the bankruptcy court must not thereafter be routinely vulnerable to nullification if a plan of reorganization is to succeed." Id. at 326.

In the Second Circuit, "an appeal is presumed equitably moot where the debtor's plan of reorganization has been substantially consummated." In re Charter Commc'ns, Inc., 691 F.3d at 482. A plan of reorganization is "substantially consummated" upon: "[i] transfer of substantially all of the property proposed by the plan to be transferred; [ii] the reorganized debtor's assumption of the debtor's business; and [iii] commencement of distribution under the plan." In re Matromedia Fiber Network, Inc., 416 F.3d 136, 144 (2d Cir. 2005) (quoting 11 U.S.C. § 1101(2)).

An appellant can only overcome this presumption by demonstrating all five "Chateaugay factors" are met. In re Charter Commc'ns, Inc., 691 F.3d at 482. These factors are whether:

(1) the court can still order some effective relief;

(2) such relief will not affect the re-emergence of the debtor as a revitalized corporate entity;

(3) such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the bankruptcy court;

(4) the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings; and

(5) the appellant pursued with diligence all available remedies to obtain a stay of execution of the objectionable order if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.

Id. (quoting Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.), 10 F.3d 944, 952–53 (2d Cir. 1993) (hereinafter Chateaugay II)).

"A chief consideration under Chateaugay II is whether the appellant sought a stay of the confirmation." In re Matromedia Fiber Network, Inc., 416 F.3d 136 at 144. Even if an appellant failed to seek a stay, however, a district court must still perform "an analytical inquiry into the likely effects of the relief an appellant seeks" to determine whether failure to seek a stay renders the relief sought inequitable. In re Charter Commc'ns, Inc., 691 F.3d at 482. However, the "question is not solely whether [a court] can provide relief without unraveling the Plan, but also whether [the court] should provide such relief in light of fairness concerns." In re Matromedia Fiber Network, Inc., 416 F.3d at 145 (emphasis in original).

B. Application

Because the Plan was substantially consummated on September 21, 2020, the appeals are presumed moot and appellants must establish all five of the Chateaugay factors to avoid dismissal. See In re Charter Commc'ns, Inc., 691 F.3d at 482. They cannot. Appellants waited more than two months to seek a stay pending appeal in the Bankruptcy Court, and they did so only three days before seeking a stay in this Court. Moreover, even if appellants' lack of diligence were not fatal to their appeals, the Plan has been substantially consummated for months and vacating the Orders or granting appellants any of the alternative requested relief would both jeopardize debtors' emergence from bankruptcy and upset—if not unravel—the numerous complex transactions underlying the Plan.

Appellants' failure to diligently seek a stay of the Confirmation Order or implementation of the Plan is fatal to their appeals. The Bankruptcy Court issued an oral ruling confirming the Plan on June 25, 2020, and entered the Confirmation Order one day later. Appellants filed their notices of appeal on July 3, 2020, but waited two months before first "request[ing]" to stay implementation of the Plan before the Bankruptcy Court in connection with an unrelated motion.

(See Doc. #56-1 at ECF 13–14). When, as here, a party has failed to "diligently pursue[] a stay of execution of the plan throughout proceedings," the Court must presume the appeals are equitably moot. See Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.), 94 F.3d 772, 776 (2d Cir. 1996) (Chateaugay III). Other courts in this circuit have found failure to take prompt action to obtain a stay, alone, warranted dismissing an appeal as equitably moot. See, e.g., In re Kassover, 28 F. App'x 100, 101 (2d Cir. 2002) (summary order).

In addition, the alternative relief appellants request, if granted, would both jeopardize debtors' emergence from bankruptcy and require unravelling numerous complex transactions agreed to in connection with the Plan. Appellants do not contend vacatur and remand of either the Settlement Order or Confirmation Order is practical or appropriate.[6] Instead, they argue the Court could fashion effective relief without unraveling the Plan by ordering several remedies: (i) requiring debtors to issue additional shares of stock for unsecured creditors and diluting the value of shares issued to secured creditors, like Elliott; (ii) disgorging stock from secured creditors; or (iii) earmarking cash payments due to debtors under the Uniti Settlement to instead compensate appellants and other unsecured creditors.[7]

Appellants seek to prioritize the claims of unsecured creditors over those of secured and first lien creditors. According to appellants, "[t]he fact that the Intervenors may receive less than

---

[6] Appellants requested vacatur and remand in their opening memorandum of law. However, in their reply memorandum of law, appellants instead argue the Court can grant effective relief without unraveling the Plan or Settlement Order. In fact, the relief appellants propose is predicated on the Settlement Order remaining in effect because appellants suggest distributing funds obtained from the Uniti Settlement.

[7] In appellants' reply brief, they direct the Court to the remedies argued for in the Equitable Mootness Motion. (See Doc. #47 at ECF 40). By directing the Court to the arguments made in that motion, appellants sought to circumvent the stipulated-to 9,000-word limit for their reply brief. The Court does not appreciate having its time wasted in this fashion.

11

they expected if the Court adopts . . . these remedies is irrelevant." (Doc. #47 at ECF 43). But appellants are wrong because the Court must consider whether it "<u>should</u> provide such relief in light of fairness concerns." <u>In re Matromedia Fiber Network, Inc.</u>, 416 F.3d at 145 (emphasis in original). Fairness compels this Court to deny appellants the relief they seek.

The success of the Plan—and debtors' corresponding emergence from bankruptcy—is predicated upon financial support from secured creditors and holders of first lien claims, including Elliott, who were compensated with equity in debtors' reorganized entities. Disgorging or diluting the value of that equity would "knock the props out from under" the Plan by devaluing support from critical parties. And that relief would require unwinding consummated transactions that have already vested equity and other rights in creditors like Elliott. <u>See</u> <u>Chateaugay II</u>, 10 F.3d at 952–53. Similar proposals have been rejected by courts in this district. <u>See</u>, <u>e.g.</u>, <u>In re Calpine Corp.</u>, 390 B.R. 508, 518–19 (S.D.N.Y. 2008) (finding proposal to issue new shares of stock reserved for old shareholders would not have "only minimal interference to other interests [and would] disturb numerous consummated transactions and further transactions taken in reliance thereon").

Moreover, the cash value of the Uniti Settlement was distributed to debtors and and thus to creditors recovering under the Plan. Earmarking that cash for appellants would jeopardize debtors' emergence from bankruptcy by diminishing their reemergent liquidity, and devaluing cash and equity distributions that have already been made to secured and first lien creditors. Accordingly, the alternative relief appellants propose would both knock the props out from under debtors' plan of reorganization and require unwinding the numerous complex transactions forming the Plan.

Finally, the Second Circuit has already dismissed an appeal from this bankruptcy as equitably moot. See GLM DFW, Inc. v. Windstream Holdings, Inc. (In re Windstream Holdings, Inc.), 838 F. App'x 634, 637–38 (2d Cir. 2021) (summary order). The appellant in that case challenged a bankruptcy court order granting debtors the authority to pay various pre-petition debts while still in bankruptcy. Id. at 635–36. Not only did the Circuit find appellant's failure to seek a stay fatal to its appeal, but also that "fairness concerns strongly counsel[ed] in favor of dismissing" the appeal because "granting GLM the relief it [sought] could cause tens of millions of dollars in previously satisfied claims to spring back to life, thereby potentially requiring the bankruptcy court to reopen the plan of reorganization." Id. at 637. Moreover, forcing creditors who had received funds to return them more than a year later would have been "highly disruptive," and thus "it would [have been] inequitable to grant GLM relief at this belated stage." Id. at 637–38. So too here.

Accordingly, the appeals are equitably moot.

## CONCLUSION

The appeals are DISMISSED as equitably moot.

The Clerk is directed to terminate the appeals and close these cases. (20 CV 4276, 20 CV 5440, and 20 CV 5529 (VB)).

Dated: June 22, 2021
White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge